# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 9, 2016

## STATE OF TENNESSEE v. WILLIAM PILLARS

### Appeal from the Circuit Court for Franklin County
### No. 20449    J. Curtis Smith, Judge

### No. M2015-01032-CCA-R3-CD – Filed April 7, 2016

The defendant, William Pillars, appeals his Franklin County Circuit Court jury convictions of rape of a child and aggravated sexual battery, claiming that the evidence was insufficient to support his convictions, that the trial court erred by improperly admitting and excluding certain evidence, that the trial court erred by admitting into evidence the defendant's prior convictions, and that the sentence imposed was excessive. Discerning no error, we affirm.

## Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

B. Jeffrey Harmon, District Public Defender, and Kandi Nunley, Assistant District Public Defender, for the appellant, William Pillars.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steve Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In November 2012, the Franklin County Circuit Court grand jury charged the defendant with three counts of rape of a child and one count of aggravated sexual battery. The trial court conducted a jury trial in November 2013.

The State's proof at trial showed that the victim, M.C.,[1] was 10 years old and in the fourth grade at the time of trial. When the victim was in Kindergarten, she

---

[1]        It is the policy of this court to refer to minors by initials.

lived in a three-bedroom mobile home with her mother, her infant sister, and her stepfather, the defendant. The victim recalled that the defendant engaged in "bad touch[ing]" with her on several occasions when the victim's mother was not at home. On one such occasion, the victim and the defendant were on the bed in the master bedroom. The defendant removed his shirt and pushed his shorts and underwear below his knees, and the victim removed her clothing as well. The defendant told the victim "that [she] was pretty." The defendant then touched the victim's chest with "[h]is mouth, his hand and his boy part" and touched her "girl part," which she described as her vagina, with his tongue. The victim drew a picture of the defendant's "boy part," which was entered into evidence and resembled a penis, and the victim described the defendant's penis as "bec[oming] hard" and having hair.

The victim testified about another occasion, on which the defendant rubbed her vagina with both his fingers and his penis "[o]n the inside" of her vagina. The victim stated that it felt "[n]asty" when the defendant did these things to her.

When the victim was in the second grade, the family moved to a duplex. The victim recalled an occasion in the master bedroom of the duplex when the defendant again pushed his shorts and underwear below his knees and the victim removed her clothing. The defendant touched the victim's "chest and [her] girl part" with his "mouth and his tongue, his hand and his boy part." On still another occasion at the duplex, the defendant told the victim to touch his "boy part" with her hand and her mouth. The victim testified that when she touched the defendant's penis, "[i]t became hard," and that "[l]iquid came out of it" onto a towel the defendant had brought to the bed with him.

The victim testified that she never told her mother about the abuse because she feared that her mother "wouldn't do anything about it" because her mother "really never listened to" her. The vicitm was also afraid to tell her biological father because "it was embarrassing and [she] didn't think [she] should talk to him about this kind of stuff." The victim eventually informed her counselor, Jennifer Loh, about the abuse after the victim's father gained custody of her on July 31, 2012.

On cross-examination, the victim stated that "[n]othing" went inside her body during the episodes of abuse. On redirect examination, the victim clarified that, on the occasions when the defendant touched his tongue and fingers to her vagina, the defendant "moved [his tongue and hand] around" and that it felt like the defendant's hand and penis "[w]ent inside" her vagina.

The victim's father, S.S.C.,[2] testified that he and the victim's mother divorced when the victim was less than one year old. In the summer of 2012, the victim's mother "[a]bandoned" the victim and her sister and moved out of the county. S.S.C. learned of this when someone from the victim's school contacted him to pick up the victim. S.S.C. gained custody of the victim at that time and made arrangements for her to speak with a counselor to address any abandonment issues. Following one of the early counseling sessions, S.S.C. had a conversation with Ms. Loh, which resulted in his contacting the Franklin County Sheriff's Department ("FCSD"). Prior to the victim's counseling sessions with Ms. Loh, S.S.C. had been completely unaware of any allegations of sexual abuse.

The victim's mother, N.L.P., divorced S.S.C. in 2004 and married B.L. thereafter, divorcing him in 2007. N.L.P. met the defendant online in 2007 and married him in 2008. During the time she was married to the defendant, N.L.P. would often leave the victim alone with him while she was at work.

In the summer of 2012, N.L.P. left home to undergo treatment for bipolar disorder. Prior to September of 2012, N.L.P. had no knowledge of the victim's allegations of sexual abuse at the hands of the defendant. On cross-examination, N.L.P. confirmed that she had obtained a divorce from the defendant in the summer of 2013.

Jennifer Loh, a private therapist and certified counselor, testified that she began meeting with the victim in August of 2012. Ms. Loh recalled that S.S.C. had arranged the counseling sessions because S.S.C.'s "sister had died and [the victim] was transit[ion]ing from living with mom to dad." At the end of her second session with the victim, the following exchange occurred:

> [The victim] looked at me and asked if anything she told me would be private, if I had to tell dad, and I explained it to her that if it was something really bad I had to tell dad, and then on the next visit she disclosed being molested by [the defendant].

At the beginning of the third session, Ms. Loh brought out dolls to use as play therapy. Using the dolls, the victim reenacted "being at [the defendant's] house in his bedroom and the things that [the defendant] did to her." Following the session, Ms. Loh met with S.S.C. and disclosed the abuse to him. According to Ms. Loh, "[i]t was very apparent" that S.S.C. was unaware of the abuse until she told him. Ms. Loh then contacted the

---

[2] To protect the anonymity of the minor victim, we will refer to her relatives by their initials.

Department of Children's Services ("DCS"), and S.S.C. contacted the sheriff's department.

FCSD Investigator George Dyer began investigating the allegations of sexual abuse after speaking with S.S.C. He observed the victim's interview with a DCS case worker, and he later spoke with the defendant over the telephone, advising him that "some allegations had been made" and inviting him to come to the sheriff's department to speak with him. Investigator Dyer did not inform the defendant of the nature of the allegations.

When the defendant arrived for his interview at the sheriff's department on September 11, 2012, he brought "some paperwork" with him. Investigator Dyer provided the defendant with his *Miranda* warnings, and the defendant signed a waiver of his rights and agreed to speak with Investigator Dyer. The defendant then handed the investigator a three-page, typewritten letter, which was entered into evidence and stated, in pertinent part, as follows:

> I never did anything that I saw as molestation. Yes I have seen her naked many times sense [sic] I knew her. Washed her hair while she was in a bath several times at her mother's request while she didn't feel good. Put lotion on her back after a bath/shower before at her request because she couldn't reach it. She either had her panties or PJs on or a towel on. The last time I seen her with out cloths [sic] was on my birthday because she came to visit. She and [her sister] were in the pool and when she came in she started to freeze due to how cold I keep the place. In my room she stood stiff due to how cold she was. She lifted her arms and asked me to help get the wet stuff off. I pulled her shirt off and she pushed her shorts down half way without bending over and I took them rest of the way and then she put a dry towel around her and I got her dry cloths [sic] and she shut the door and got dressed. . . .
>
> Now yes she has seen me naked also. She has walked in while I was dressing before. She has opened the shower Curtin [sic] while I was in it and saw me washing. Not sure why she did and it was more than once. Nothing I really wanted to speak about because someone might think something like they do now. One time she came in the bathroom while I was showering and looked in at me and I

was standing there with my eyes closed masturbating and enjoying the moment.  Not sure how long she was standing there but she saw me [ejaculate] and that is when I saw her standing there watching.  She shut that Curtin [sic] and left after I saw her.  I asked her what did she want after words [sic] and she said she had a question but forgot it.  Told her next time holler at me.  Didn't want to talk about what she saw because I didn't want to have that conversation.  Kept it between us because I didn't want her in trouble for coming in because I always tried to protect her.  She had a thing about lotion.  She would want to lotion my feet and legs sometimes after she did her self.  She even told her mom once after she did it because neither of us thought anything of it.  Well at least I didn't.  There was one time she was going up my leg and I think slipped because her hand went strait [sic] up my shorts fast and her hand ended up with my bare privates in her hand for a second.  I was surprised and she acted as if she was but it took her a second before she released it and pulled her hand back.  I figured it was because it caught her off guard so much she froze for a moment.  I slid back in my seat in shock when it happened.  She laughed and said she slipped and asked if I was ok.  I said yes and she went to a foot and ended there.  We didn't talk about it.  I guess we should of [sic].

There was random times she was showing herself to me.  Once on Vine st. [sic] she walked up and lifted her night gown and said her privates were burning and was showing me with her hands down there and holding it open.  I got up and got her some medicine we had for that and asked if her mom showed her how to put it on and said said yes and went to the bathroom and did it.  Let's just say she never had a problem being nude around me from the beginning to this year.

. . . . Once in our Belvidere home she was hugging me with her legs wrapped around my waist and I was holding her up.  She started to slide down but I didn't foresee what would happen.  As she slid over my waist my shorts came down.  I felt them moving but could [sic] do anything because I was holding her up.  As she landed on the ground so did my shorts. Her face was just inches from my penis until I stepped back and pulled them back up.  It was like that for a brief

second. I even told her I was sorry that happened and I couldn't stop it unless I dropped her on the wood floor. She told me not to worry about it and it was ok and wanted to jump on me again but I didn't. . . .

. . . .

Back with another memory that I forgot all about. I think she was 7 and it was here where I live now, that's what I'm seeing in my mind. We were on the floor wrestling and she was sitting on my chest. Then she moved forward pushing her crotch against my face (yes dressed) and moved a couple of times like a grind before I pushed her off. She just laughed about it. I remembered it bothered me because she did something that she saw or did before I felt. I debated on calling her moms attention to it because it wasn't right. I knew I had no proof and I could be wrong and she could just have thought it was funny and that was all it was. But now I do remember that moment and how unsettling it was.

With this evidence, the State rested. Following a *Momon* colloquy and the trial court's denial of the defendant's motion for judgments of acquittal, the defendant elected to testify.

The defendant admitted that he had a prior conviction of larceny and an unspecified drug conviction. With respect to his care of the victim during his marriage to N.L.P., the defendant stated that the victim had asked him to assist her with washing her hair, with which he complied, but the defendant denied engaging in any sort of inappropriate touching while the victim was bathing. The defendant also stated that he would assist the victim in applying lotion to her back.

In early September of 2012, N.L.P. informed the defendant that the victim was accusing him of "molestation." At that point, the defendant prepared his typewritten letter. In response to the inquiry of his motivation to write the letter, the defendant testified as follows:

I wanted to show that throughout our life and this is five year span. It isn't like what was read in here was like a month of incidents. We're talking a five year span, and I wanted to show that there was no way things that happened in our life could be classified. Now, I never imagined the actual claims

were totally different than what I was talking about in here, because they are against me, but I went in there because when I went in there to see the detective I never foresaw this. I never seen anything legally like this. My only thought was I wanted my child, and this is what was stopping me. I didn't see any actual legal type of stuff like this coming from it, because my whole thought was just go in there and try to show him how with [N.L.P.] leaving and the timing and everything, this just happens to come up with the counselor she just met, and just the time alone, I was trying to show them there is no way through our life that this kind of stuff could have happened, which I didn't know what kind of stuff he was talking about.

The defendant testified that the segment in the letter regarding his "masturbating in the shower" was false, explaining that he had included that part "to know if what [the detective] was going to tell me was going to be true." The defendant believed that if the detective read the entire letter and responded, "oh, yeah, we know all of this," then the defendant would know the detective was lying. The defendant categorically denied engaging in any sexual contact with the victim.

Based on this evidence, the jury convicted the defendant as charged of three counts of rape of a child and one count of aggravated sexual battery. Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to a term of 12 years' incarceration for the aggravated sexual battery conviction and 25 years' incarceration for each of the three child rape convictions, all to be served at 100 percent by operation of law. The court ordered the aggravated sexual battery conviction and the first two child rape convictions to be served consecutively to one another and ordered that the third child rape conviction be served concurrently with the second child rape conviction but consecutively to the other two convictions, for a total effective sentence of 62 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the evidence is insufficient to support his convictions, that the trial court improperly excluded evidence on the basis of hearsay, that the trial court erred by permitting the State to question the defendant about his religious beliefs, that the trial court improperly allowed sexual abuse testimony under the fresh complaint doctrine, that the trial court erred by admitting into evidence the defendant's prior convictions, and that the sentence imposed was excessive. We will address each issue in turn.

*I. Sufficiency*

The defendant contends that the evidence is insufficient to support his convictions of rape of a child and aggravated sexual battery. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim" if the victim is between the ages of three and 13. T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7). Aggravated sexual battery "is unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). "Sexual contact" is defined as including "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

In the instant case, the proof at trial established that, while living in the mobile home, the defendant touched the naked victim's chest with his mouth, hand, and

penis and that he touched her vagina with his tongue. This sexual contact is clearly sufficient to establish the defendant's conviction of aggravated sexual battery. With respect to the convictions of child rape, the victim testified that, while living at the mobile home, the defendant touched her vagina "[o]n the inside" with his fingers and tongue, which sufficiently satisfies the requirement of sexual penetration. Likewise, the victim testified to two separate incidents that occurred at the duplex: one in which the defendant touched her vagina with his tongue, hand, and penis, and one in which the defendant forced the victim to engage in fellatio. On redirect examination, the victim clarified that, on the occasions when the defendant touched his tongue and fingers to her vagina, the defendant "moved [his tongue and hand] around" and that it felt like the defendant's hand and penis "[w]ent inside" her vagina. Again, this testimony cogently established the defendant's sexual penetration of the victim. Although the defendant denied all abuse and questioned the victim's conflicting testimony about penetration, such matters of witness credibility and evidentiary weight are within the exclusive province of the trier of fact, and this court will not reweigh such evidence. *See Dorantes*, 331 S.W.3d at 379.

Viewing this evidence in the light most favorable to the prosecution, we find that the evidence adduced at trial more than sufficiently established the defendant's convictions of aggravated sexual battery and rape of a child.

## *II. Hearsay*

Next, the defendant contends that the trial court erred by sustaining the State's objection to certain hearsay. During the cross-examination of Investigator Dyer, defense counsel sought to inquire whether N.L.P. had told the defendant about the allegations of sexual abuse, and the State objected on hearsay grounds. The court sustained the objection on the basis of hearsay. On appeal, the defendant argues that this decision constitutes reversible error.

The defendant's argument on this issue, however, contains no citation to authority or legal argument. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Ct. Crim. P. 10(b); *see also* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on"). Because the defendant failed to comply with these rules, he has waived our consideration of this issue.

### III. Religious Beliefs

The defendant next asserts that the trial court erred by permitting the State to question him about his religious beliefs, in violation of Tennessee Rules of Evidence 403 and 610. We disagree.

Prior to trial, the defendant filed a motion in limine, seeking to prevent the State from introducing into evidence "references to angels or demons or the like in letters allegedly written by the [d]efendant." At the hearing on the motion, the State informed the trial court that it intended to cross-examine the defendant at trial – if the defendant chose to testify – about statements he had made in five separate letters about battling "demonic oppression." The trial court reserved ruling on the admissibility of the letters until trial.

When the defendant indicated his intention to testify following the close of the State's proof at trial, the trial court revisited the issue. The State argued that it should be allowed to question the defendant about whether alleged demonic possession caused him to sexually abuse the victim. The defendant then objected on the basis of both Tennessee Rule of Evidence 610 and 403, contending that the defendant's religious beliefs were inadmissible to attack his credibility and that, in any event, the probative value of such evidence was substantially outweighed by the danger of unfair prejudice. The trial court found that Rule 610 was not applicable and, following extensive analysis of the letters, ruled that the State could inquire about specific statements in the letters that the court deemed probative.

On cross-examination, the State chose not to question the defendant about any of the specific statements in his letters. The State did, however, question the defendant as follows:

> Q:     Mr. Pillars, are you a religious man?
>
> A:     Yes, I am, sir.
>
> Q:     Did you get God in November of 2012, when you were indicted for this charge, or these charges that we're here now?
>
> A:     No, I did not get God. I stopped running from God.
>
> Q:     Stopped running from God. Did you have urges before you accepted God?

A:      You'd have to define the word urges.

Q:      Sexual urges.

A:      I was married and I produced a child.

[Defense Counsel]:  Your Honor, I'm objecting.  It's still a vague question.

A:      Yes.

[Defense Counsel]:  He doesn't say what type of sexual urges.

[Prosecutor]: That will be my next question.

The Court:    All right.

Q:      Did you have sexual urges that you put away once you got God in November of 2012?

[Defense Counsel]:  Again, the same objection, Your Honor.  He's not saying what type of sexual urges.

[Prosecutor]: That's the next question.

The Court:    Overruled.  Let him ask.

Q:      I'm going to ask it one more time.  Sir, did you have sexual urges that went away, that you sent away when you got God in November of 2012?

[Defense Counsel]:  Your Honor, once again, same objection.

[Prosecutor]: Judge, I'll ask it again.  The next question is specific.  This is a general question.

[Defense Counsel]:  Well, he can't answer the question.

The Court:    I've overruled your objection, Counsel.

Q: Answer the question. I'm not going to ask it again. Surely you've heard it, it's been the third time it's been overruled.

A: Due to the fact that I was set free from my wife and I wasn't having another woman at this moment, yes, sir, because in my belief that is wrong to be lusting after a woman when you're not with a woman in marriage, so, yes, sir.

The defendant argues on appeal that the trial court "committed reversible error by allowing the State to question him in regards to any matter of a religious nature when they were irrelevant and prejudicial in nature, in violation of Tennessee Rules of Evidence 403 and 610." The record is clear, however, that the defendant objected to this line of "religious" questioning on the basis that it was vague, not that the questions asked were violative of Rules 610 or 403. "A party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994); *see also State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988) (holding that a party cannot object on one ground at trial and assert new basis on appeal). In any event, we determine that these minor references to God and religion did not inure to the defendant's prejudice.

*IV. Fresh Complaint*

Although the argument is somewhat convoluted, it appears that the defendant contends that the trial court erred by permitting the victim to testify on direct examination that she told her counselor, Ms. Loh, about the sexual abuse. The defendant bases his argument on the theory that this testimony was inadmissible under the fresh complaint doctrine.

The fresh complaint doctrine permits the *fact*, but not the *details*, of a complaint of rape in the case of an adult victim to be admitted during the State's case-in-chief. *State v. Kendricks*, 891 S.W.2d 597, 603 (Tenn. 1994). In child rape cases, however, neither the fact nor the details of the complaint may be admitted in the State's case-in-chief, unless admissible under a hearsay exception or to corroborate a prior consistent statement. *State v. Livingston*, 907 S.W.2d 392, 395 (Tenn. 1995).

In the instant case, the defendant argued prior to trial that the State should not be permitted to present the testimony of Ms. Loh regarding the victim's alleged disclosures of sexual abuse. The trial court agreed, finding that "any reference by Ms.

Loh . . . of sexual abuse would be a conclusion based on comments made to her, statements made to her, by the alleged victim, so I believe that that is – would be essentially fresh complaint, which . . . is not admissible." The trial court then went on to say that "if the child's credibility is attacked then the [S]tate can come back and offer bolstering testimony."

On appeal, however, the defendant contends that the trial court erred by permitting the *victim* to testify on direct examination that she disclosed the sexual abuse to Ms. Loh. The defendant did not object to this particular testimony at or prior to trial. It is well-established that a litigant may not advance one theory for inadmissibility of evidence at trial and another on appeal. *See, e.g., Adkisson*, 899 S.W.2d at 635; *Aucoin*, 756 S.W.2d at 715. Furthermore, the defendant's failure to lodge a contemporaneous objection to the victim's testimony results in a waiver of plenary review of this issue. *See* Tenn. R. Evid. 103 ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection . . . ."); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987). In consequence, we must conclude that this issue has been waived.

## V. Prior Convictions

Next, the defendant argues that the trial court erred by admitting into evidence the defendant's prior convictions of larceny and drug possession.

Tennessee Rule of Evidence 609 provides, in pertinent part:

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:

. . . .

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness

was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release. Evidence of a conviction not qualifying under the preceding sentence is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect.

Tenn. R. Evid. 609(a)-(b).

Prior to trial in the instant case, the State filed a notice of intent to use the defendant's 1989 larceny conviction and 2003 felony drug possession conviction for impeachment purposes if the defendant were to testify. The trial court conducted a hearing on November 5, 2013. The defendant argued that the larceny conviction was stale, which would require the court, under Rule 609(b), to determine whether the probative value of the conviction outweighed any prejudicial effect. The State responded that, because larceny is a crime involving dishonesty, its admission was probative of the defendant's credibility. With respect to the drug conviction, the defendant cited *State v.*

- 14 -

*Waller*, 118 S.W.3d 368 (Tenn. 2003), for the proposition that drug convictions do not involve dishonesty and are accordingly "only slightly probative" of the defendant's credibility. *Waller*, 118 S.W.3d at 372-73. The State argued that the felony drug conviction was admissible under Rule 609(a)(2). At the conclusion of the parties' arguments, the trial court simply stated, "[Y]ou have two cases, not one, and a long hiatus of nothing, so I'm going to allow both of those [convictions] in."

Without question, the defendant's 1989 larceny conviction was beyond the 10-year time limit contemplated by Rule 609(b), but in any event, the trial court failed to make an appropriate determination that the probative value of either conviction outweighed its prejudicial impact. *See* Tenn. R. Evid. 609(a)(3), (b). As a result, we hold that the trial court erred by admitting these prior convictions into evidence at trial. However, given the overwhelming evidence of the defendant's guilt, any error occasioned by the admission of these convictions was harmless. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

## *VI. Sentencing*

Finally, the defendant contends that the trial court erred "by imposing a sentence that was both excessive and improperly applied." Again, we disagree.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive

sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

Following a sentencing hearing, the trial court took the matter under advisement and later issued a comprehensive sentencing memorandum, in which the court based its decision on a consideration of all required factors. The court found no mitigating factors and only one enhancement factor to be applicable: that the defendant abused a position of public or private trust. *See* T.C.A. § 40-35-114(14). The trial court "place[d] great weight on this enhancing factor." The court then imposed the minimum sentence of 25 years for each of the three child rape convictions and the maximum sentence of 12 years for the conviction of aggravated sexual battery. Because the trial court considered all relevant principles associated with sentencing, no error attends the imposition of these within-range sentences.

With regard to sentencing alignment, the trial court based its imposition of partially consecutive sentencing on the fact that the defendant was convicted of two or more statutory offenses "involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim . . ., the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim." *See* T.C.A. § 40-35-115(b)(5). The trial court found that the defendant abused his relationship with the victim, his stepdaughter, and referenced the length of that relationship. In addition, the court considered the victim impact statements introduced into evidence at the sentencing hearing, in which S.S.C. recounted the "many nights with [the victim] screaming, crying, and hitting pillows to try to let out some of her anger" and opined that the victim would require therapy for the rest of her life. Although the defendant posits that the record "contained absolutely no proof that the [d]efendant was a danger to the public" or "that he had ever made improper advances toward anyone other than his stepdaughter," no such findings were required under the requisite statute. Because the trial court considered the appropriate statutory principles, we cannot say that the court abused its discretion by ordering partially consecutive sentences.

*Conclusion*

Based upon the foregoing analysis, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE